The next case on our docket is going to be 514-0408, Griffin v. Cohen. Is that correct? All right. I want to get this right. Mr. Zerkulak. May it please the Court, my name is Brian Zerkulak. I represent the Plaintiff Appellate, the estate of John Holland, Jr., in our appeal of an order granting summary judgment to the defendant, dated June 19, 2014. The purpose of a summary judgment proceeding is not to try an issue of fact, but rather to determine whether an issue of fact exists between the parties. I think it is clear based on the evidence before the Court under this review de novo that there exists several issues of material fact in this case which would preclude the granting of summary judgment. A reading of the Court's brief order dated June 19, 2014 indicates that the Court did not apply the generally recognized principles for granting a summary judgment motion, which is considering all the evidence before the Court consisting of pleadings, depositions, affidavits, the like most favorable to the non-moving party, which is the estate in this case, and strictly adjuring that evidence against the moving party, which is the defendant, Joseph Cohn, in Joko Poole's. A further reading of the Court's order dated June 19 indicates not only did the Court not apply these general principles, but relied upon a case which had absolutely no bearing on a motion for summary judgment, the case being Sallow v. Singers. The case of Sallow issued by this district in no way dealt with a motion for summary judgment. That case dealt with whether or not it was appropriate to give the jury a comparative negligence instruction on behalf of the plaintiff, or against the plaintiff, I should say, on behalf of the defendant based upon the evidence before the Court. And in that case, this district decided that the comparative negligence instruction was not appropriate, and since the jury abound for the plaintiff in that case, but reduced their verdict by discomparative negligence, entered verdict for the full amount. The case of Sallow, I think, is a demonstration of what turns out to be a continuation of this defendant's attempt to mislead the Court as to what really we're here to do. And again, it's just simple motion for summary judgment. Longstanding has been the principles applied to granting or denying a motion for summary judgment. I've outlined for the Court both in my brief, as well as in the pleadings before the trial court, as well as in the transcription of the oral argument on the motion to reconsider, the multitude of issues which are in dispute in this case. I note in reading the defendant's testimony that they're moving one step further beyond Sallow, and they're now arguing that where they put forth some evidence that the deceit, John Sullivan Jr., my client, or the father of my clients, the two clients in this case, or the next of kin, ran the stop sign, that I must put forth evidence that he stopped at the stop sign, or I cannot prove my case. That is not the law in the state of Illinois. It's certainly not been the law in the state of Illinois since 1981 in the Supreme Court case of Alvis v. Rybar. The plaintiff need not prove that he or she is free from comparative negligence to succeed in her court of negligence. No more than the plaintiff must prove that he or she stopped at the stop sign for the plaintiff was comparatively negligent. Without me doing anything beyond what the defendant has attempted to prove, the jury may still find that the defendant failed its burden. And I'm not arguing to the court here that this case doesn't merit a comparative negligence instruction against the deceit of the state. I would admit that it does. But to say that if I don't put forth evidence, my client died in this accident. He's not here to speak for me, of course. If I don't put forth evidence that he stopped at the stop sign, I cannot prove my case. And that simply is not what the burden of proof instruction under IPI 21.02 in the state of Illinois requires. It's just not the law. I can, if the court would like, state the numerous inconsistencies that exist in the evidence, particularly the testimony of the defendant, Joseph Cohen, and of their only other witness, Justin Woodward, regarding my client's conduct before the accident took place. I'm interested in the accident reconstruction list. Yes, ma'am. As I understand it, the report indicates that but for Mr. Cohen making the swerve, that the accident could have been avoided. That is correct. So the argument seems to be based on the case cited by the defendants, that there is a per se rule that as long as you're on a preferential highway, no matter what the cause, the plaintiff is out. Is that what's being advocated? I think it is. But of course, that is not what SALUT stands for, and nor does Johnson v. May, the other case that they cite, or any of the subsequent cases that I cite, such as Powell v. Deeds Foods, or Twait v. Owens, I think, or if it partly was the defendant, I think it's Owens. And what's interesting about the SALUT case, which was decided in 1986, and again, that didn't deal with the motion for summary judgment. That dealt with, should we instruct the jury on comparative negligence for the plaintiff? In all of these cases, they get to a jury. So the plaintiff still has to prove his case in SALUT. He still had to prove his case in Johnson, just like in Powell Foods and in Twait. What this court did, and it did it very clearly, and I think it did it very purposely, after citing the statute with respect to stopping at a stop sign, which I think is 904B of the Illinois Motor Vehicle Code, this court followed up with the very next paragraph and stated, however, everyone who reads this, keep in mind, the driver on a preferential roadway does not have the absolute right to proceed in the face of danger. They cannot plunge forward blindly. In fact, this court places three duties on the driver on the preferential roadway. The duty to keep a proper lookout. The duty to exercise due care in approaching and crossing intersections, which in this case involved an intersection. And the duty to act as a reasonably prudent person would to avoid a collision when a danger is sensed or when a danger should have been recognized. Those are three duties this court placed on the driver of the preferential roadway, and I think this court did it very purposely. You know, I've been 18 years representing accidents with preferential roadways. First time I've heard of Sallow was this case, which is, I say this lightly in a jest, it's not surprising because the defendant in Sallow, the attorney for this defendant, was the attorney that had the non-preferential driver in Sallow and successfully argued to the trial court to give a comparative negligence instruction. So I'm sure this case has been in their pocket for 18 years. It hit me like a hammer over the head when I first saw it in this case because we were here to argue a motion for summary judgment. And it has gone beyond a motion for summary judgment. The two witnesses, the defendant, Joseph Cohen, biased, interested, prejudiced. A guy who says that, I braked, then swerved. Their expert says, no, not my expert, their expert. No, he swerved, then braked. The Randolph County coroner, Randy Dudenbosel, elected official who showed up at the scene, pursued his job, talked to the defendant at the scene, and the defendant, Joseph Cohen, told coroner Dudenbosel, I slammed on my brakes and the weight of my truck, my trailer and bobcat, 10,000 pounds, being pulled by a 5,000-pound truck, down a steep grade Route 3 marked twice with a designated runoff road at the bottom by I-dot because of the grade of this road, said my trailer and bobcat pushed me into the oncoming lane. Those are three different things. This accident, the entirety of this accident, the Dodge 250, the 18-foot tandem axle trailer, my client's Chevy S10, the entirety of this accident took place in my client's lane of travel, not the defendant's. That's not the case at Sallow, not the case at Johnson. Those accidents took place in the preferential roadway lane of travel. Excuse me, the runoff lane that you mentioned, I didn't see that in the facts, but was that where he, the defendant, contended there was wood stacked or railways? Sort of. What's interesting about that, two points on the railroad ties. You know, there was actually a lawsuit that preceded my lawsuit, and the lawsuit that preceded my lawsuit was a lawsuit by Joseph Cohen against my estate, claiming he was injured, that my estate was at fault for his injury. His attorney was Steve Stone. And the defendant, Joseph Cohen, gave a deposition in that case before I was ever involved. He gave it to a defense attorney, Steve Buser, I think his name is, on behalf of State Farm for my client's insurance company. In that deposition, when I'm not involved and he's not a defendant, he's a plaintiff and feeling pretty bald and gregarious, says, you know, common question, sir, this oncoming lane of traffic for my client was guarded by a guardrail the entire length of that road. So as you go down Route 3 from Chester to your left, the highway going back into Chester is guarded by a guardrail that intersects with Mary's River Road and runs up to the right. And to the right of Route 3 to the south is an 11-foot asphalt shoulder, five more feet of compressed rock, 16 feet of flat surface. And then in the grass, 200 feet past the intersection, about eight feet in the grass, the defendant says, there's a six-foot-high pile of railroad ties. And I couldn't go right and instead went into the oncoming lane because if I knew I wouldn't ride, I would hit those railroad ties and I would die. Problem is, there was not a six-foot-high pile of railroad ties, as the defendant testified in his first deposition, because we looked at the photographs of the State Police, 90 of them weren't there, and I said, where are they at? It was miles from them. They were there two weeks earlier. These railroad ties weren't on the asphalt surface, they weren't on the rock shoulder, they were about eight feet in the grass, nearly 200 feet past the intersection. And that was the reason why he couldn't go to the right, to answer your question. Okay, but he then, at another point, had said that I guess he jackknifed or something after he applied his brakes. Yes, ma'am. And when did he say that? He told the cornerback at the scene. Which, by the way, in the deposition, so now when I get his deposition, I'm a little bit more prepared for this guy, I think, than maybe in his first deposition. And so, you know, I ask some really simple questions. Did you talk to anyone at the scene? Oh, no. Oh, no, sounds pretty good. Let's try it specifically. Did you talk to Corner Randy Dudenbosel at the scene? Nope. Hmm. Did you talk to any police officers at the scene? No, no, no, no. They talked to no one. Yeah, Randy Dudenbosel testified under oath. I stood right there on the roadway. Next to me was my deputy, Corner Janice Barber, and I talked to him. And not only does he say the jackknifed trailer that throws him in the oncoming lane of traffic, he tells Corner Dudenbosel other things that he said differently in his first deposition and in his second deposition to me, such as, in his deposition the first time and the second time to me, he says, as he approached the vehicle driven by Mahalan, if he was, in fact, driving it, according to the defendant, he may not have been, he was instead slumped over, lying prone in the passenger seat, unconscious before the accident. Wait, you just said if he was driving? Well, I said as he approached the vehicle being driven by Mr. Mahalan, my client, which I believe my client was behind the wheel and driving it. Okay. I didn't understand that. Yeah. I didn't understand. I mean, I understand what you said. But I didn't understand that in the briefs. Yes. How we got from driving to before the accident, I see him slumped over. Yes. And then someone else says, I could see the look on his face. I didn't understand that either. I think I can clarify that for all of us. Absolutely. So, again, Mr. Cohen has the reins in his hands in this deposition. I'm going to give an opportunity to explain the story. You don't know about Corner Dudenbosel or what Dudenbosel is going to testify to. But Dudenbosel hasn't given his deposition yet. I say, what did you see before the moment of impact? And what he says was, he says many things, but we'll get to what we're talking about here. I see the Chevy S10 enter into my lane of traffic and there's no one behind the wheel. There isn't? Nope. And as I'm about to hit him and I'm only eight feet away, I see that the driver, who's John Mahalan, Jr., is slumped over, laying on a passenger seat with his head by the door, unconscious. Maybe dead. I don't know. But he's not behind the wheel and he's not in control of the vehicle. The problem with that is, the photographs taken at the scene, while Mr. Mahalan is still in the truck, has a shoulder belt and lap belt across him. They cut it to release him to get him out of the truck. There's no way that shoulder belt's going to allow him to lie prone across the passenger seat. But more importantly, Court of Dudenbosel testified that Joseph Cohen said it was awful. As I was just feet away, I could see the look of terror in Mr. Mahalan's eyes as we locked eyes. Little different than lying prone, the seat prone, unconscious. Another one of those, oops, caught you. That's what the Court of Dudenbosel says. So are the depositions from the other lawsuit, are they part of the record? They are not. Nope, I just haven't had them before I took his deposition. Just to see how consistent he was between the two depositions. So that's another thing that's sort of omitted with respect to Joseph Cohen's testimony and the testimony of the Court of Dudenbosel, things that conflict. What's also interesting is at the scene of the accident, when he's not talking to anybody, not talking to the state police, not talking to the coroner, he fails to mention that he was on a handheld cell phone while he was driving down that steep grave talking on the telephone. Doesn't tell anybody about the cell phone. Even writes a handwritten statement signed that day in the hospital. Doesn't mention the cell phone. Doesn't mention the railroad ties to Court of Dudenbosel. I said, Court of Dudenbosel, did he say anything about not being able to ride because of railroad ties? He never said anything about the railroad ties. He went left because the trailer pushed him left. Wrote a statement, doesn't mention the railroad ties. Does he mention to you that Mulholland is slumped over the passenger seat unconscious? Is he writing this little statement to the state police? Nope. I say to Mr. Cohen, I say, Mr. Cohen, you're just holding all these things in your deposition. You haven't even written a statement. That day, I don't see the railroad ties. I don't see slumped over the passenger seat. I don't see the cell phone. Don't you think those things are important to tell the state police? He says, yeah, they are. You didn't do it, did you? No, I didn't do it. I didn't do it. Gosh, I don't know why I didn't do it. Now, those are issues of material fact with respect to Joseph Cohen. Prejudice, bias, interest in party. The only other witness, of which there are potentially two, are Mom, Barbara Woodward, I think that's her first name, I apologize, and Justin Woodward. They're traveling from Murfreesboro going to Chester. They're to the east of the railroad tracks that are just to the east of Mary's River Road because you come down this long straight way from Murfreesboro. There's some railroad tracks, berms, trees, all this good stuff. And then beyond that is Water Street coming down, and you go up into Chester. So they're coming towards the scene. Mom and son. Mom 40-something, son 16. Mom says, I'm behind you in my car. I'm driving. I've got my son right there. I'm concerned for his safety. I'm not drunk. Not on a cell phone. I'm alert. I'm looking forward. And I say, ma'am, did you see my client come down Water Street and run the stop sign? She says, I never saw your client at all. Did you see Joseph Cohen in his big tandem axle trailer coming down Route 3, approaching Water Street, coming towards you? Never saw him at all. Did you see the accident, this massive, violent collision between the two vehicles  with no obstacles like a power box, trees, berms? No? Didn't see it at all? But somehow her 16-year-old son, and we know how observant 16-year-old children are, from 500 feet away, Quincy watches it all. He watches Mr. Pollack come down there. He watches him blow through the stop sign. Watches the collision. Boom, it's all. It's terrible. It's terrible. It's pretty interesting. So let's talk about what you saw, Mr. Woodward. Now, you would agree that when you first saw Mr. Pollack coming down Water Street, you were the furthest from the accident you would have been that day because you were traveling towards the accident, correct? Yes. About 500 feet away. I say, sir, circle the stop sign that you saw him run. I give him a state police photograph that shows the front of a red stop sign in the photo. He circles it. He says, that's it right there. I say, okay, that's pretty good. How many stop signs control Water Street? Ironically, Water Street has two stop signs. Why, I don't know. But this is Water Street coming to Route 3 right here. There's one stop sign 90 feet back on the right and another stop sign up here on the left about 20 feet off the roadway. So there's two, 90 and 20. The one that's near the roadway, 20, is the one that's red based on the camera looking down Route 3 from just its perspective. So I say, so son, that's the one you saw him run, right? Yep. How many stop signs on Water Street? He says, well, just one. So let's look at a photograph. How many stop signs does this photograph show? Well, it shows two. And you saw him run this one. No, I didn't see him run that one. I saw him run the one 90 feet up the hill. Did you see the red part of that stop sign? No, I could see the silver back side. Now, a standard stop sign is 32.5 inches in diameter. From 500 feet away, this kid saw the silver back side of a stop sign through what he admitted was an elevated berm there at the railroad crossing, a railroad control box, a runaway ramp sign, trees that blocked the vision between himself and Water Street, but none of them obscured his vision. Okay, so the witness says he got that right. He watched him on the stop sign. So let's talk about four other key critical things involving the accident that you observed. Excuse me, but he did alert his mother, didn't he, to... He said stop. Stop because he had... There was an accident. Stopped, there's an accident? That's correct. I thought it was stopped there, he'd run the stop sign. No, if you read the mother's deposition, she says her son, he ran the stop sign seven times. Then when I asked Justin, did you tell your mother that the deceased ran the stop sign, he said I never told her that he ran the stop sign. I said stop, there's going to be a collision. Okay, stop. You'll have some time to finish that. Since we're... Oh, I'm out of time? I'm out of time. I'm sorry. I'm doing a time constraint. Okay, Mr. Hasenstab. Thank you, Your Honor. I beg your support, counsel. My name is Dan Hasenstab, representing the appellee, Joseph Cohen, and his company, Joko Pools. I just want to address some of the arguments that my co-counsel made before I dive into my own argument here. First of all, he's misconstruing my position here. I'm not taking the position that as a matter of law, his client was contributory with negligence. That's not our argument. Our argument is that as a matter of law, there's no evidence of any negligence on the part of my client that would have been a proximate cause of this accident. That's what our position is. And that's what Salo supports. And he makes a distinction that Salo is not a summary judgment motion, but it was decided on the judgment notwithstanding the verdict, and it was a situation where this court took away a jury verdict that found 60% liability on behalf of the driver on the preferential roadway, which in this case is my client. He's on the preferential roadway. And they didn't say that that was against the manifest way. Well, it said it was against the manifest way of the evidence, first of all, but didn't send it back for a new trial. This court said they reduced it down to 0%. There was no liability as a matter of law on behalf of this driver on the preferential roadway. So to say that Salo is completely irrelevant because it wasn't decided on a summary judgment issue I believe is misleading. I think Salo is directly on point because Salo discusses the duties of the driver on the preferential roadway vis-a-vis someone coming on a non-preferential roadway. And what Salo says is that the driver on the preferential roadway has a right to expect that the driver at the stop sign is going to stop and is going to yield the right-of-way to the driver on the preferential roadway. And that's the focus of our argument here is that Cohen had a right, as he was driving down this roadway, to expect that Mulholland was going to stop at the stop sign and yield the right-of-way. And as much as the co-counsel would like to attack Mr. Cohen, attack Mr. Mulholland, the simple fact is there is absolutely no evidence that he stopped and yielded the right-of-way. There are two witnesses, Cohen and Justin Woodward. Well, as I understand it, Justin gave no testimony regarding him failing to stop at the stop sign that's the immediate stop sign going into the intersection. What Justin testified to is that when he saw the vehicle traveling at a constant rate of speed, did not slow down, did not change its speed, drove straight from Water Street into this intersection. Now, these two stop signs, one is a little bit closer and the one is closer, or one is you go counter one and then you counter one right at the roadway. But what he testified to is that he saw this vehicle coming at a constant rate of speed without slowing, without stopping, probably right into the intersection. He was unambiguous in that testimony. He said he clearly remembers that, and as counsel pointed out, there's evidence that he even alerted his mom before the accident happened, hey, this guy's not going to stop. You know, he alerted her after he saw this developing, this car coming through. And Cohen himself, I mean, we argue he's a biased witness, obviously, as he's a party to the case, but he testified the same thing. He said he saw this car coming down Water Street, but not on a frontal road, not stopping, not slowing down, running straight into the intersection. We have two witnesses who say that. We have presented evidence. We've met our burden under the summary judgment proceeding to present sworn evidence that this guy did not stop at the intersection. Whatever the reasoning may be, if he was passed out, if he didn't pay attention, it's not relevant for our purposes. We're not arguing he was contributory negligent for purposes of this summary judgment proceeding. What we're saying is that there is no question of fact that he did not stop at this intersection Okay, given that, if we assume that, that does not negate the fact that your client has certain duties as well. That's correct, Your Honor. And I believe that that's what your opponent is raising as issues of material fact that are disputed. That's part of the argument. It seemed like you spent the majority of your argument saying that there was some kind of question of fact Well, I think he is contending that. But I'm just saying, assuming that there is no question about that, don't you still have those other issues of your client's duty? I'm not saying that my client is a per se situation. So you're not asking for a per se rule? No, I'm not, Your Honor. I recognize there are exceptions to this. Do you believe this case is an exception? No, I don't, Your Honor. Why? Here's why. Because the cases that have, all the cases that he cited where the court found that there was a question of fact as to whether the driver on the preferential road was negligent are all situations where there was evidence of some negligence on the part of the driver on the preferential roadway. That was an approximate cause of the accident. But that's what he's trying to develop, I believe. And those cases were cases that went to verdict. Correct, Your Honor. Each one is distinguishable. In each one of those cases, there was evidence of some type of negligence on the part of the driver on the preferential roadway that contributed to the accident. But at this stage, don't we have to look at what evidence he's trying to raise in the light most favorable to him? Yes. And I mean, I'll address that in a brief. And there's three, I mean, he has three theories. So, for example, if he's talking on the cell phone, which you point out he has the legal right to do, but that doesn't make it the safe and reasonable thing to do when you're going down steep incline with a heavy load and you're approaching an intersection, aren't we supposed to view that in the light most favorable to your opponent? Well, I mean, he has to also present evidence that talking on the cell phone was in some way an approximate cause of this accident. Well, it could have distracted him from keeping a proper lookout in approaching an intersection and avoiding a dangerous situation. Well, I mean, he could speculate to that, but there's no evidence to that. I mean, the only evidence we have is, I mean, Mr. Cohen said that as soon as he saw the driver go through the intersection, he dropped the phone and began to take evasive action. I mean, that's the only evidence we have with regards to his use of the cell phone. But one of the other duties set forth in this case is that he has to drive as a prudent person would to avoid a collision. Correct. Which is why I was asking about the investigator's report, accident reconstruction report, because there seems to be at least one fact that maybe your client didn't do what the ordinarily reasonably prudent person would do to avoid this accident. He actually went into the oncoming lane of traffic, and the trooper who did the accident reconstruction at least seems to say he could have avoided the accident completely. Do you not think that's a question of fact? I agree, Your Honor, that there's evidence that had he maintained his lane and just slammed on his brakes, that the accident could have been avoided. My response to that is the doctrine of the sudden emergency situation, is where when a driver of a vehicle is faced with a sudden emergency and imminent peril, he's not required to possess the same fullness of judgment as when there is no imminent peril. So if you were talking about a guy who— That's a jury decision, isn't it? Well, not necessarily, Your Honor. Both of the—at least the traffic cases that I found that address this particular doctrine, the Yates and the Wheelmere case, both found that as a matter of law in those situations. So they didn't say that the jury has to—that there's a special jury instruction in this particular circumstance. There may be. I mean, that could be argued, but in these particular cases that I found, they said that in those situations they could not find any—they could not hold as a matter of law that there was a potential negligence on the part of this driver who's faced with a sudden situation, and he takes evasive action, which at the time he believes to be reasonable because he— it turns out there was no railroad ties on the side. He testified that he saw them weeks earlier. He's familiar with the road. He thought that they were there. He didn't think that was—you know, we're talking split-second decisions here. I understand, but the one that you've described? Yes. There's three split-second decisions that went on, depending on who you believe. One is that your client hit the brakes and the weight carried him forward. Another one is that your client went into the oncoming lane of travel. And the third one is that it could have been avoided completely. I mean, there's just—somebody had to resolve and has to resolve that, I think, because that duty does exist for your client, doesn't it? Well, I think the duty exists. Like I said, I think the duty can't—I mean, we can't look back at what could have happened. I mean, he could not have predicted based on that situation. No, I'm saying we don't know what he really did. Whose word are we supposed to take? Regardless of what he did, I mean, he took evasive action immediately upon recognizing this danger, which is what his duty was under the law. Now, what type of evasive action he took, I believe, is holding him to a possibly high standard because he would have to predict exactly what Mulholland's vehicle was going to do, a car he saw just seconds before. He would have to judge the distance between his vehicle and the intersection. He would have to immediately be aware of all of his surroundings, any dangers that were posed by going right, by going left, by going straight, and calculate all that within a matter of a split second to come to a decision. And I think that's what the Gates case is, what the Wheelinger case, when they say that the driver faced with emergency and imminent peril is not required to possess that type of coolness, that type of judgment, that he took what he believed at that point to be the correct evasive action. And it turned out that if he had—you can see, if he had stayed completely in his lane, had not swerved, the accident could have been avoided. But there's no way that he could have predicted that based on the split seconds that he had to make a decision. But what about the fact that even going into an oncoming lane may be negligent, forgetting everything else? The statute says a driver is to maintain his vehicle in his lane of travel. Moving out of your lane of travel is going to require some explanation, right? That's correct, Your Honor. If this case were to proceed to trial, would your client even testify? Would he testify? Yeah. I believe he would testify. Under the Dead Man's Act? Well, he isn't—I think he's essentially waiving the Dead Man's Act argument. I thought that only applies to trial. Well, I could be wrong. Well, my thought is that I don't know that you can take any of these isolated facts and dispose of them and say that that's a legal question versus a jury. It seems to me there's a series of factual disputes that may enter into whether or not he was keeping a proper lookout and whether or not he, as he approached the intersection and acting as a reasonable person who's driving a trailer with a significant load and talking on a cell phone, going down a steep grade, perhaps even exceeding the speed limit, according to, I think, one of the experts. I mean, those are all kind of cumulative facts that may carry weight. Well, I mean, I think he has to show that there was some proximate cause between any of those allegedly negative facts and the accident. And I don't think he's met his burden to prove that the speed of the vehicle had any bearing on the cause of the accident or the use of the cell phone. I do agree that the evasive measure that he took, swerving as opposed to staying in his lane, that did make a difference. I mean, at least there's evidence that that would have avoided the accident. But I think that's where I come back to the sudden emergency doctrine. I believe those cases are set as a matter of law. They didn't say that it was a jury, so the jury should have to decide. But they said as a matter of law, that's a matter of what the person's duty is when faced with an imminent danger. And those cases are what? It's Gates v. Shackelford. Gates? Gates, I'm sorry. Y-A-T-A, yes. And it's Wilmere v. Stippold. Wilmere v. Stippold, this were of oncoming traffic. Gates was, I believe it was on the interstate, something that spurred some of these lanes. Both, you know, traffic accident cases, so that's why I cited them both. And I cited them more so for the principal. I think that applies over here. The drivers in both of those situations were faced with imminent peril, which was not their fault. I mean, there's no question this guy, right after the stop sign, ran right into this guy's right-of-way. So to hold him to a standard where he has to calculate the best course of action and figure out what course of action, and that's Plasek, is going to best avoid this accident, or best preserve his own life, too. I mean, he testified his deposition, you know, he was afraid for his own life, too. So to have to impose a duty upon a person in that kind of situation to assess the same type of reasonableness or coolness that a driver in not facing the situation I think is not only unfair, I think it's, as the law says, it's just not something that they're required to do. I don't think I have anything else. Are there any other questions? Very good. Thank you very much. Thank you. Mr. Zirkelbach, are you feeling well, ill? Well, last week, Your Honor, I had abdominal surgery, and apparently I might have a... We don't require rebuttal. I shouldn't be in a hospital. I need to get this case. It's very important that I get this case done. I'm just letting you know, we don't require it. Well, thank you for accommodating me. Let me go first, Your Honor. I appreciate that. No problem. You may sit if you would prefer. I'm still alive right now. I'm going to make a motion. You're upright, but you may sit if you feel the need. I think the cell phone business... I love when I hear this, oh, I haven't proved anything. That's garbage. A cell phone, if there's evidence a cell phone uses properly before the jury, that's the Kelly Eagle File case of Tom Keith that I mentioned, the state trooper in that tragic, devastating accident on 64. He denies he's even on a cell phone. I don't need an expert to say that the cell phone contributed to the defendant's negligence. That's no good. This whole eminent apparel business, first off, that rings pretty true to Twain v. Olsen, which, in that case, the defendant Farley was found negligent when he was speeding on the preferential highway. The plaintiff, Twain, was in a car entering onto the preferential highway. An accident happened. And there the evidence was Farley, even though he was on a preferential roadway, was running hot. He was speeding. He kind of created this eminent danger. So just because he's on the preferential roadway, that's not the end of all the discussion. And defense counsel talks about this eminent apparel. The eminent apparel here was created by the defendant's own conduct. Running 60 to 63 miles per hour at a 55-zone point, 10,000 pounds down a steep grade, reduces your time to react. Add a cell phone to it and a six-speed manual truck, it really reduces your time to react. That's not on the decedent. That's on the defendant. He created this eminent apparel. Anyone familiar with that intersection knows that that is a common traveling roadway for trucks with Gilster Mary Lee from Southern Illinois Transport. They're at the river. And those trucks come down that hill at 30 miles an hour, and they're screeching their brakes and they're bouncing, turning up that roadway all the way down to Water Street. Mr. Cohen wasn't the first time he was on that road. He was on that road hundreds of times. He knows this. So eminent apparel, he created the eminent apparel by running hot and being distracted. And also, the business of swerving, you know, the actual reconstruction testimony that damns them is their own expert, Nathan Sugamira, who's a great guy, and when he realized he was caught, testified honestly and admitted about avoiding a collision and had to stay in his own lane. Mr. Sugamira testified that when he began to swerve into the oncoming lane, he was 200 feet from the intersection, and my client was 60 feet from entering his lane. So this isn't a case where someone's in your lane and I better get the heck out of it. At 200 feet away, according to him, he decides to go left. When, in fact, a truck and trailer pushed him left. My client was 60 feet from the intersection at the time he made this split-second decision. So I think in listening to the court's questions to defense counsel that there's really no reason to perceive that you get it, you know, My client, Justin Woodward, says the accident happened to Joseph Cohen's lane when it struck him at 300 feet away. He's wrong. He says Joseph Cohen's truck doesn't strike the guardrail. His truck damages 28 feet of guardrail. He's wrong. He says he never sees a trailer or Bobcat the entire day. He doesn't even know it exists until I show him the photo for the first time. This giant monstrosity bounced across his view and landed on his shoulder. Kid's wrong. He's wrong four times, but the one time he's right is when he's 500 feet away seeing a silver galvanized stop sign. Your Honor, I appreciate your time again, your courtesy, and letting me go first. Okay. Thank you. Good luck to you. Thank you. Okay, this matter will be taken under advisement and a disposition will be issued in due course.